## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**GLENNIS J. HOBBS,**

      **Plaintiff,**

**vs.**                                  **Case No.  3:19cv777-LC/CAS**

**ANDREW SAUL,**
**Commissioner of Social**
**Security,**

      **Defendant.**
_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's application for Supplemental Security Income (SSI) filed pursuant to Title XVI of the Social Security Act (Act) and an application for a period of disability and Disability Income Benefits (DIB) filed pursuant to Title II of the Act.  After consideration of the entire record, it is recommended that the decision of the Commissioner be reversed and the case remanded for further consideration.

Case No. 3:19cv777-LC/CAS

## I. Procedural History

On August 20, 2015, Plaintiff, Glennis J. Hobbs, filed applications for DIB and SSI, alleging disability beginning March 22, 2014, based on academic barriers, history of back injury, pinch nerve/lumbar spine, left hip problems, diabetes, blurred vision, high blood pressure, and bilateral occasional hand numbness.  Tr. 17, 315, 321.[1,2]  Plaintiff last met the insured status requirements for DIB on June 30, 2016.  Tr. 17, 36.

Plaintiff's applications were denied initially on October 5, 2015, and upon reconsideration on January 20, 2016.  Tr. 17, 131-72.  On January 26, 2016, Plaintiff requested a hearing.  Tr. 17, 213-14.  An initial video hearing was held on June 7, 2017, before ALJ James F. Barter, who presided over the hearing from Mobile, Alabama, and Plaintiff appeared in the office of his counsel, R. Ian MacLaren, an attorney, in Pensacola,

---

[1]  Citations to the transcript/administrative record, ECF No. 9, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.

[2]  On June 18, 2012, Plaintiff filed SSI and DIB applications which, after hearing before Administrative Law Judge (ALJ) Katie H. Pierce, were denied on March 21, 2014.  Tr. 77, 114-22.  In those applications, Plaintiff claimed his disability began on June 2, 2011, which was amended at the hearing to June 1, 2012.  Tr. 114.  On August 8, 2015, the Appeals Council denied Plaintiff's review of the ALJ's March 21, 2014, decision.  Tr. 127-30.

Florida.[3]  Tr. 17, 74-109.  Jody Skinner, an impartial vocational expert, testified during the initial hearing.  Tr. 17, 74-109, 407-08 (Resume). Plaintiff also testified.  Tr. 83-102.

On January 12, 2018, the ALJ held a supplemental video hearing, presiding from Mobile, Alabama, and Plaintiff appeared in the office of his counsel in Pensacola, Florida.  Tr. 17, 33-72.[4]  Plaintiff testified during the supplemental hearing.  Tr. 13, 38-42.  Richard W. Freeman, an impartial vocational expert, also testified.  Tr. 17, 42-51, 412-13 (Resume).

On July 5, 2018, the ALJ issued a decision and denied Plaintiff's applications for benefits, concluding that Plaintiff was not disabled from March 22, 2014, through the date of the decision.  Tr. 17-27.

---

[3]  Toward the end of the initial hearing, considering Plaintiff's testimony and the ALJ's concern regarding a lack of physician support (by Thomas R. Schneider, M.D., *see* Tr. 78-82) for Plaintiff's disability claim, Plaintiff's counsel requested the ALJ to refer Plaintiff for a consultative examination regarding Plaintiff's diabetes and diabetic neuropathy.  Tr. 107-08.  The ALJ stated he would consider the request.  Tr. 108.  This issue is discussed in more detail herein and gives rise to a recommendation of reversal.

[4]  At the outset of the supplemental hearing, the ALJ stated that he had determined he "needed to get some extra questioning from the vocational expert, so that's why [he] ask[ed] him to do this."  Tr. 36.  Plaintiff's counsel stated he had additional evidence from Dr. Schneider supporting Plaintiff's disability claims.  Tr. 37. The document supplemented the January 13, 2016, Medical Source Statement (MSS) provided by Dr. Schneider in which he recommended "permanent disability."  Tr. 473-74 (Exh. B7F).  The record was supplemented with a June 19, 2017 (12 days after the initial hearing of June 7, 2017) audio transcript of a dialogue between Mr. MacLaren and Dr. Schneider.  Tr. 538-41 (Exh. B13F).

On July 16, 2018, Plaintiff submitted a request to review the ALJ's decision.  Tr. 290-93.  On September 6, 2018, Plaintiff's counsel filed a two-page brief, which appears as Exhibit B22E.  Tr. 5, 416-17.  On February 19, 2019, the Appeals Council noted that it had considered the two-page brief and denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5; *see* 20 C.F.R. § 404.981.

On April 18, 2019, Plaintiff, by counsel, filed a Complaint with this Court seeking review of the ALJ's decision.  ECF No. 1.  The parties filed memoranda of law, ECF Nos. 15 and 16, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings:

1. "The claimant meets the insured status requirements of the Social Security Act through June 30, 2016."  Tr. 19.

2. "The claimant has not engaged in substantial gainful activity since March 22, 2014, the alleged disability onset date."  *Id.*

3. "The claimant has the following severe impairments: degenerative disc disease lumbar spine, diabetes mellitus, obesity, peripheral neuropathy, and adjustment disorder."  *Id.*  The ALJ also determined that Plaintiff's complaint of right ankle pain was a non-severe impairment "causing no significant limits in ability to perform basic work activities."  Tr. 20.

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix

1."  Tr. 20.  The ALJ noted that "[t]he medical evidence of record does not document abnormalities necessary to meet the criteria of any listings, including listing 1.04 governing disorder of the spine."  *Id.*  The ALJ considered the "paragraph B" criteria including the severity of Plaintiff's mental impairments in relation to the criteria of listing 12.04 and determined Plaintiff had *mild* limitation in understanding, remembering, or applying information; *moderate* limitation with regard to concentrating, persisting, or maintaining pace; and *mild* limitation for adapting or managing oneself.  *Id.*  The ALJ also considered the "paragraph C" criteria and determined the evidence failed to establish the presence of these criteria.  *Id.*

5. "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he cannot climb ladders, ropes or scaffolds.[5]  He can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch or crawl.  He cannot work at unprotected heights, around dangerous machinery or operate automotive equipment.  He is limited to frequent handling and fingering.  He is limited to the simple, routine tasks of unskilled work that involves simple work decisions with few changes."  Tr. 21.

6. "The claimant is unable to perform any past relevant work."  Tr. 25.  The vocational expert testified that Plaintiff's past relevant work is classified in the Dictionary of Occupational Titles (DOT) as material handler, heavy, semi-skilled with an SVP rating of 3 and an industrial cleaner, medium, unskilled with an SVP rating of 2.  *Id.*; *see* Tr. 42, 62.  The ALJ omitted the latter job but included the other information.  Tr. 25.

---

[5]  *See infra* at n.10 regarding the applicable regulations.  The RFC is the most a claimant can do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all the relevant evidence including the claimant's description of his limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  Although an ALJ considers medical source opinions, the responsibility for determining a claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c); *see* 20 C.F.R. § 404.1527(d); *see also* Bell v. Bowen, 796 F.2d 1350, 1353-54 (11th Cir. 1986).

7. The claimant was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.[6]  Tr. 25.

8. "The claimant has at least a high school education and is able to communicate in English."[7]  *Id.*  "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills."  *Id.*

9. "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform."  Tr. 26, 57-71. Although the ALJ determined Plaintiff had the RFC to perform a full range of light work, his ability to perform all or substantially all of the requirements of this level work has been impeded by additional limitations, and, as a result, the ALJ asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and RFC.  *Id.*  The vocational expert testified that such an individual would be able to perform the requirements of several representative occupations including mail clerk, information clerk,

---

[6]  "If you are younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work.  However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work in persons who have not attained age 45.  See Rule 201.17 in appendix 2."  20 C.F.R. § 404.1563(c).

[7]  In the initial March 21, 2014, decision, ALJ Pierce determined that Plaintiff had "a limited education."  Tr. 120.  During the initial hearing before ALJ Barter, Plaintiff testified he had a high school diploma, Tr. 83, but later clarified that it was "a special ed diploma."  Tr. 91.  "It's because I can't – I've been having trouble understanding what I read and write.  And I can't write that good."  Tr. 91.  The ALJ referred to Exhibit B1F which is a Psychological Evaluation performed when Plaintiff was in the first grade in 1983.  Tr. 420-21.  The report indicated Plaintiff was "functioning in the low average range of ability according to the WISC-R."  Tr. 421.  Another document from 1986 stated, in part, that Plaintiff was "severely emotionally handicapped."  Tr. 419.  These documents were from the School District of Escambia County.  Tr. 419-21.

and parking lot attendant, each light exertion, unskilled, with an SVP of 2. Tr. 57-71.[8]

10.    The claimant has not been under a disability, as defined in the Social Security Act, from March 22, 2014, through the date of the date of [the ALJ's] decision."  Tr. 26.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The

---

[8]  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  A Specific Vocational Preparation (SVP) of 1 means "short demonstration only."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An (SVP) of 2 means "[a]nything beyond short demonstration up to and including 1 month."  *Id.*  "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id.*  Unskilled work corresponds to an SVP of 1 and 2.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).  "In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[9]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted). A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage

---

[9] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 404.1505(a), 404.1509 (duration requirement).[10] Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).

In addition, an individual is entitled to DIB if he or she is under a disability prior to the expiration of his insured status, here June 30, 2016, Tr. 17. *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

---

[10] The relevant DIB and SSI regulations are virtually identical. As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise. The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, *e.g.*, 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

3. Does the individual have any severe impairments that meet
   or equal those listed in Appendix 1 of 20 C.F.R. Part 404,
   Subpart P?

4. Does the individual have the RFC to perform work despite
   limitations and are there any impairments which prevent past
   relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in

disapproval of the application for benefits.  A positive finding at step three

results in approval of the application for benefits.  At step four, the claimant

bears the burden of establishing a severe impairment that precludes the

performance of past relevant work.  Consideration is given to the

assessment of the claimant's RFC and the claimant's past relevant work.  If

the claimant can still do past relevant work, there will be a finding that the

claimant is not disabled.  If the claimant carries this burden, however, the

burden shifts to the Commissioner at step five to establish that despite the

claimant's impairments, the claimant is able to perform other work in the

national economy in light of the claimant's RFC, age, education, and work

experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224,

1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786

F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) - (g).

An ALJ may make this determination either by applying the grids or by

obtaining the testimony of a vocational expert.  <u>Phillips</u>, 357 F.3d at 1239-

40; *see* 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner

carries this burden, the claimant must prove that he or she cannot perform

the work suggested by the Commissioner.  <u>Hale v. Bowen</u>, 831 F.2d 1007,

1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that he is disabled, and

consequently, is responsible for producing evidence in support of his claim.

*See* 20 C.F.R. § 404.1512(a)(1); <u>Moore</u>, 405 F.3d at 1211.

## IV.  Legal Analysis

**Substantial evidence does not support the ALJ's overall evaluation of the medical evidence and the need for a consultative examination and ultimate determination that Plaintiff was not disabled as of the date of the decision.**

I.

Plaintiff makes two arguments.  First, Plaintiff argues the ALJ did not

"set forth the 'good cause' necessary to discredit the opinion of" Plaintiff's

treating physician, Dr. Schneider, in that the ALJ ignored the lengthy

statement by Dr. Schneider of June 19, 2017, ignored the record evidence

of Plaintiff's foot examinations, and provided an inadequate rationale to

discredit Dr. Schneider's opinion.  ECF No. 15 at 2.  Second, Plaintiff

argues the ALJ should have developed the record further through a

consultative examination considering Plaintiff received treatment at a

charity clinic and his physician explained that no further testing was available.[11]  *Id.* at 22-31.

The Commissioner argues the medical evidence of record supports the ALJ's decision to assign little weight to Dr. Schneider's opinion and that no consultative examination is required.  ECF No. 16 at 12-15.[12]

## II.

As the finder of fact, the ALJ is charged with the duty to evaluate all the medical opinions of the record and resolve conflicts that might appear. 20 C.F.R. § 404.1527.[13]  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, such as "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole;

---

[11]  The ALJ has a duty develop the record fully and fairly.  Graham v. Apfel, 129 F.3d 1420, 1422-23 (11th Cir. 1997).

[12]  An ALJ may reject an opinion that is so brief and conclusory that it lacks persuasive weight or is unsubstantiated by any clinical or laboratory findings.  Phillips v. Barnhart, 357 F.3d at 1240-41.

[13]  This provision applies to claims filed before March 27, 2017.  For claims filed after that date, section 404.1520c, titled "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017," applies.

(4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors. 20 C.F.R. § 404.1527(b) & (c)(1)-(6).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). "This requires a relationship of both duration and frequency." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no

weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supported a contrary finding," the opinion is "conclusory or inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence or is wholly conclusory."  Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

Opinions on some issues, such as whether the claimant is unable to work, the claimant's RFC, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of the case; *i.e.*, that would direct the determination or decision of disability."  Although physician's opinions about what a claimant can still do or the claimant's restrictions are relevant evidence, such opinions are not determinative because the ALJ has responsibility of assessing the claimant's RFC.  *See supra* at n.5.

III.

Plaintiff testified at both hearings before the ALJ.  The ALJ summarized his testimony and reports of disability, which provides a factual context for the discussion of the medical record that follows.

> At the initial hearing, the claimant testified that that he is unable to drive due to pain when pressing his foot to shift gears and clutch; but can drive his brother's car, which is automatic.  Other reports include difficulty sitting for periods longer than 45 minutes at one time (even when riding in a car); and standing for about 10-20 minutes maximum.  He is able to walk about 500 feet then has to sit down due to feet hurting.  He can lift 10-20 pounds without causing back problems.  At the supplemental hearing, the claimant testified that he uses a cane to walk indoors because it helps with his balance. The claimant reports that he currently manages his diabetes with diet and administers his own  insulin.

Tr. 21-22; *see* Tr. 38-42, 85-101.[14]  It is noted that Plaintiff

---

[14]  The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).  Although the ALJ did not

reports problems dropping things and unable to pick up objects. He presented at the hearing, wearing braces on his hands that he purchased at Wal-Mart. The claimant testified that he wears wrist splints all the time, including at night. He testified that he could lift a gallon jug of water, but that it might slip out of his hand. Noteworthy, on examinations of record, there is no evidence of positive Tinell's [sic] or Phalenus (Exhibit B3F).

Tr. 24.[15]

IV.

In the prior case before the SSA, ALJ Pierce determined that Plaintiff had several severe impairments including degenerative disc disease of the lumbar spine with likely radiculopathy and hypertension. Tr. 116. ALJ

_____

expressly refer to the three-part pain standard set forth in Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002), the ALJ's findings, discussion, and citation to 20 C.F.R. § 404.1529, Tr. 21, indicate that the pain standard was applied. Wilson, 284 F.3d at 1226.

[15] Effective March 28, 2016, the Social Security Administration adopted SSR 16-3p, 81 Fed. Reg. 14166, 2016 SSR LEXIS 4 (Mar. 28, 2016), superseding SSR 96-7p, 1996 SSR LEXIS 4, pertaining to assessing the claimant's credibility. New SSR 16-3p, 2016 SSR LEXIS 4 removed the term "credibility" from the policy, stressing that an adjudicator evaluating a claimant's symptoms will "not assess an individual's overall character or truthfulness" but rather will focus on the two-step evaluation, specifically "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." Id. at 14170-71. See Arnold v. Soc. Sec. Admin., Comm'r, 724 F. App'x 772, 782 (11th Cir. 2018) (unpublished). In Arnold, the Court noted that "on October 25, 2017, the [SSA] republished SSR 16-3p, 2016 SSR LEXIS 4 with the revision that it was 'applicable on MARCH 28, 2016,' and explained that its 'adjudicators will apply this ruling when we make determinations and decisions on or after March 28, 2016,' and that it expected that federal courts reviewing those determinations and decisions would do so 'using the rules that were in effect at the time we issued the decision under review.' 82 Fed. Reg. 49462-03, 49468 & n.27 (Oct. 25, 2017)." Arnold, 724 F. App'x at 782.

Pierce considered Plaintiff's history of headaches and shoulder pain but found the complaints non-severe.  Tr. 117.  ALJ Pierce also considered Plaintiff's medical records mostly occurring at St. Joseph Medical Clinic in and around 2012 through September 2013.  Tr. 118-19.  There was no discussion of Plaintiff's diabetes or peripheral neuropathy, as here. Tr. 114-22.  Plaintiff's alleged disability date is March 22, 2014, the day after ALJ Pierce's decision.  Tr. 17, 122.

Here, the records begin with 1983 (first grade) school district evaluations of Plaintiff when he was reported to have cognitive functioning in the low average range.  Tr. 421.  His AIC on January 6, 2012, was 5.1, Tr. 457, but medical records generally begin with a return visit to St. Joseph Medical Clinic (Metabolic Syndrome Clinic (MSC)) on March 20, 2013, for a refill for Lisinopril and follow-up for back pain and on April 10, 2013, for a re-fill for Tramadol and for left back shoulder pain.  Tr. 447-48.

Several return visits occurred on May 1, 2013 (follow-up on back) and May 29, 2013 (left leg and hip/back ache); July 17 and 31, 2013; September 25, 2013; January 15, 2014; April 9, 2014 (reference to judge denial/not enough data)[16]; July 17, 2014 (Plaintiff felt poorly; vision blurred; in ER day prior; out of meds; frequent urination; prescribe 500 mg of

---

[16]  This was after the March 21, 2014, denial of benefits.  Tr. 122.

Metformin-increased to 1,000 mg twice a day; blood sugar at 303 mg) and July 31, 2014[17]; August 7, 19, 2014 (high blood pressure; improved blood sugar; noted to suffer from diabetes, depression, degenerative disc disease of the lower spine, and degenerative joint disease of the right leg), and August 27, 2014 (MRI indicated mild facet arthropathy); December 2, 2014 (on diabetic drugs for five months; Metformin; blurry vision at times; blood pressure and sugar levels improved); April 5, 2015 (diabetic; gaining weight; *peripheral neuropathy*; seeing lawyer for disability); April 8, 2015 (some non-specific complaints; same symptoms), and April15, 2015 (labs excellent; lungs clear; no suicide; + depression); May 14, 2015 (reporting type II diabetes; dental problems; HBP; abnormal LFT; degenerative arthritis; obesity ("present major problem"); and September 2, 2015 (reporting feet tingle, feet and hand numb at times). Tr.  429-48.  Several lab reports are also included with these records and, relevant here, his AIC was 10.9, (>6.4 diabetes) on August 5, 2014, and on April 9, 2015, was 5.5 under the "increased risk for diabetes: 5.7–6.4," Tr. 451, 454; *see* Tr. 22.

In September 2015, three reports were submitted including a functional adult report, supplemental pain questionnaire, and third-party

---

[17]  The assessment included Type II diabetes, HBP, and L5 disc disease-chronic pain-see G [illegible] notes.  Tr. 439.  The plan included starting Metformin *etc.  Id.*  The July 31st note noted Plaintiff reported blood sugar at 303 and Metformin was increased. Plaintiff was alert and conversant.  Tr. 438.

function report.  Tr. 335, 343, 351.  These documents note Plaintiff's

limitations that are confirmed by another.

On September 22, 2015, Plaintiff was seen by primary physician

Michael E. Kasabian, D.O., for a SS disability examination.  Tr. 459-63;

*see* Tr. 22, 24.  Plaintiff advised that he has hypertension, diabetes, low

back pain, both of his hips hurt, and left groin hurts at times.  His

medications included Flexeril, Accuretic, Glimepiride, Metformin, and a

baby aspirin once a day.  "He was told by a doctor recently that his liver

enzymes were elevated."  Tr. 459.  "Visual fields are intact to confrontation

testing.  Conjunctivae clear."  *Id.*  His speech and hearing were normal for

conversation.  His L2-3 area was tender with flexion; peripheral pulses

were intact and equal in all four extremities; and no joint effusions were

appreciated.  *Id.*  Muscle strength was 5/5 in all four extremities and deep

tendon reflexes were +2/4 in all four extremities; negative straight leg

raising in sitting and supine positions; fine grip dexterity was normal; he can

grasp fine objects without too much difficulty; cerebellum was intact; no

"past-pointing was demonstrated"; he had a cane, but could ambulate

without the cane although "very slowly, presumably due to low back pain."

*Id.*  All the range of motion tests were normal for Plaintiff's right and left,

although four of the items on the left do not have a number.  Tr. 461-63.

Dr. Kasabian's impressions included history of low back pain, bilateral hip pain, liver enzyme elevation, hypertension, diabetes, and possible eczema. Tr. 460.

On September 29, 2015, Steve Hirschhorn, Ph.D., performed a general clinical evaluation with mental status having been referred from the Medical Disability Adjudicator, Florida, Department of Health.  Tr. 465; *see* Tr. 23.  Plaintiff did not appear to be physically uncomfortable.  As for complaints, Plaintiff endorsed being somewhat depressed, but stated that his back and leg pain deters his employment.  He reported having a special education certificate, and able to barely read and write.  He is prescribed medication for high blood pressure, Metformin and Glyburide for diabetes and states that he has numbness in his feet as well as migraines.  He advised of chronic pain in his back and leg, rating it as an eight or nine daily on a scale of one to ten.  Tr. 465.

His employment history included working as a logger for approximately four years until being told that he needed a new hard hat, chaps, and safety glasses; he stated that their cost was more than he was making so he left.  He also worked for Wynn-Dixie for a year, 'pushing carts.'  He worked at the Salvation Army as a truck driver for two years but had difficulty getting along with the residents who were supposed to help

him on his routes but did not work hard enough to suit Plaintiff.  He worked

at Sam's Club for approximately four years but was fired 'because [he] had

migraines.'  He also worked during the BP cleanup in 2010 but has not

worked subsequently, "stating that his back and leg pain made it much too

hard."  Plaintiff did odd jobs a few years ago, such as cutting grass.

Tr. 466.  Plaintiff's daily activities included grocery shopping, doing laundry

and housework and he acknowledged that he drove to the examination.

Tr. 466-67; *see* Tr. 23.

On examination, Plaintiff was able to complete the serial threes in 47

seconds with one minor miscue; he could spell "WORLD" accurately

forward but in reverse incorrectly.  He presented incidents of having

difficulty getting along with others.  A thought disorder was not present and

his IQ "is probably in the borderline or low average range."  Tr. 466; *see*

Tr. 23.

Plaintiff was diagnosed with an adjustment disorder with mixed

anxiety and depressed mood, moderate; mild intellectual disability;

diabetes, *diabetic neuropathy*, back and leg pain, high blood pressure,

migraines; and problems with academics, occupation, loss, finances, and

access to medical care.  Tr. 466.  Plaintiff was competent to handle his

finances.  *Id.*  He walked using a cane.  Tr. 466-67.  After providing a

summary of his findings, Dr. Hirschhorn recommended Plaintiff be referred to a psychiatrist.  Tr. 467.[18]

On October 25, 2015, Plaintiff was seen in the emergency room at Sacred Heart Hospital complaining of right ankle pain, Tr. 499-500; *see* Tr. 469-70, 495-507.  A series of x-ray films of the right ankle showed no acute fractures or dislocation; bones showed normal contour and alignment.  Tr. 501, 505-06.  The physical examination was generally normal, including Plaintiff's gait, although he ambulated with a cane.

---

[18]  On November 13, 2015, Plaintiff had a "brief assessment appointment" at Lakeview Center, Baptist Health Care (Lakeview).  Tr. 530.  He was depressed all the time, divorced, no job, at home all day, and he had no social life.  *Id.*  On February 16, 2016, Plaintiff was assessed at Lakeview.  Tr. 532; *see* Tr. 23.  Plaintiff reported a history of depression related to several psychosocial stressors.  *Id.*  On mental status, Plaintiff was oriented times four.  His thought content and processes were unremarkable.  His mood was depressed with congruent affect, but otherwise normal.  The diagnoses were indicated to meet criteria for persistent depressive disorder, late onset, consistent with persistent depressive episode, moderate; and somatic symptom disorder with predominant pain.  Tr. 534.  Plaintiff was recommended to engage in OP (out-patient) group therapy to address issues related primarily to depression and Plaintiff agreed.  He was not recommended for OP psychiatry services at this time.  Tr. 535.  Plaintiff was a no-show on March 16, 2016.  Tr. 531.

Tr. 501.  The final diagnosis was "ankle pain."  *Id.*[19, 20]

Plaintiff had several blood tests on January 12, 2016 (AIC of 5.9);

April 7 (A1C of 7.6); August 22, 2016 (A1C of 7.7), and on February 7,

2017 (A1C of 6.4). Tr. 516-29.  Screening for diabetes on January 28,

2016, revealed *neuropathy*, Tr. 516, but the treatment notes of April 7,

2016, again from Norman McFadden, M.D., make no mention of foot or

hand problems.  Tr. 513.

---

[19]  On January 20, 2016, and on reconsideration, Robert Steele, M.D., performed a record evaluation.  Tr. 168; *see* Tr. 25.  His evaluation is consistent with light exertion, and according to the ALJ "merits significant weight."  *Id.*  George Grubbs, Psy.D., also provided a record evaluation on January 11, 2016, on reconsideration.  Tr. 170; *see* Tr. 25.  The ALJ gave Dr. Grubbs' evaluation "great weight" "regarding social functioning; and related to concentration, persistence, and pace because the findings were generally consistent with the evidence presented at the hearing level as evaluated under the revised medical criteria."  *Id.*  An ALJ can assign great weight to the State agency physician opinions where the expert opinions are supported by and are consistent with the record as a whole.  Ogranaja v. Comm'r of Soc. Sec., 186 F. App'x 848, 850-51 (11th Cir. 2006) (unpublished); 20 C.F.R. §§ 404.1513a(a)(1), (b)(1), 404.1527(e) (explaining that State agency medical and psychological consultants are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluations); *see* SSR 17-2p, 2017 SSR LEXIS 2, at *5 (eff. Mar. 27, 2017).  As discussed in more detail herein, the problem here is the timing of their record evaluations considering Plaintiff's ongoing health degradation and two and one-half years intervening thereafter and when the ALJ rendered his decision on July 5, 2018.  Tr. 27.

[20]  The ALJ noted that Plaintiff "does not have any psychiatric admissions or referral for psychiatric treatment.  In any event, giving the claimant the benefit of the doubt in formulating the [RFC] finding, the claimant is precluded from climbing ladders, ropes and scaffolds and working around unprotected heights and dangerous machinery and equipment.  The undersigned also acknowledge[s] that the claimant's IQ function and pain can cause reduction in the ability to concentrate and accordingly limits the claimant to simple routine unskilled work."  Tr. 24.

Plaintiff was seen once again at MSC at St. Joseph Medical Center on January 6, 2016, complaining, in part of back pain with a negative MRI and "hip pain but can walk." Tr. 518 (Dr. Schneider). It appears this is Plaintiff's first visit with Dr. Schneider. *See* Tr. 22 ("The claimant established care with [Dr. Schneider] at St. Joseph's Medical Clinic in January 2016.")

On January 13, 2016, Plaintiff visited the MSC complaining of lower back pain and disability forms were filled out. Tr. 517. (Dr. Schneider). Also, on January 13, 2016, Dr. Schneider filled out a Medical Source Statement (MSS), checking numerous boxes, stating that a cane was medically necessary because Plaintiff has *neuropathy*, and that Plaintiff has depression and frequent urination and fatigue. Dr. Schneider concluded that Plaintiff has a "permanent disability." Tr. 473-74. The ALJ considered Dr. Schneider's MSS and stated:

> Based on a [MSS]-Physical on January 13, 2016, Dr. Schneider opined that the claimant could lift 5 pounds occasionally; sit for total one hour in an 8-hour workday, but not able to stand and/or walk any. The claimant could not use his feet for repetitive movement to push/pull. The claimant was unable to tolerate exposure to extreme cold or heat; wetness/humidity; vibrations and hazards. He would likely be absent from work on average 5 or more times per month; and have pain exacerbation requiring additional breaks 5 or more times in an 8-hour workday for 10-20 minutes at a time; and able to maintain focus and concentration on simple, repetitive work for only 10-20 minutes due to depression. A MRI at Joseph Medical Clinic

on April 7, 2016 to assess complaint of low back pain was
negative.  (Exhibits B4F, B7F, B10F).

Tr. 22.

As of the date of Dr. Schneider's MSS, substantial evidence supports

the ALJ's determination that the medical records do not support

Dr. Schneider's conclusion rendered at this time.  *See infra* at n.27 for a

detailed discussion of the weight generally given to check-off medical

evaluations.

On January 28, 2016, Plaintiff returned to the St. Joseph Medical

Clinic for lab review with a note that "[h]e is a well[-]known metabolic clinic

patient."  Tr. 516.  His blood sugar was 122; he states he feels well but

lower back and legs remain painful.  The assessment included

hyperlipidemia, *neuropathy*, DM well controlled.  *Id*.  He was to start

Crestor and Lyrica and liver enzymes were to be checked in three months

and he was to return to the metabolic clinic.  *Id*.

On February 24, 2016, Plaintiff returned to the MSC and it is noted, in

part, that he went to Lakeview and going to OP group therapy.  *See supra*

at n.18.  He was encouraged to walk on a treadmill.  His A1C was 5.9 and

weight was stable with "neuropathy," Tr. 515 (Dr. Schneider).  He returned

on March 9, 2016, and on April 7, 2016, it is noted by Dr. McFadden that

Plaintiff's high blood pressure was elevated but he was not taking his meds

for two weeks.  DM and HTN are noted.  There is no mention of foot

problems or a problem with Plaintiff's hands or feet.  Tr. 513-14; *see* Tr. 22.

On August 23, 2016, lab analysis noted blood sugar of 140 and an A1C of

7.7.  Tr. 522-23.

On May 19, 2016, Plaintiff was also examined at the emergency room

at Sacred Heart Hospital, complaining of cough/congestion.  Tr. 480, 483;

*see* Tr. 22.  Records show Type II diabetes *without complication* and

essential hypertension as clinical diagnoses.  Tr. 479.  The review of

systems (ROS) indicated, in part, that Plaintiff denied vision changes,

denied myalgias, reported blood sugars have been well controlled, and

negative psychiatric review of systems and denied suicidal ideation.

Tr. 483.  Plaintiff's past medical history included a history of diabetes, HTN,

and DDD.  Tr. 484.  The physical examination revealed, in part, a normal

back exam including findings of normal inspection and range of motion and

no costovertebral angle tenderness.  The upper extremity exam was

normal including findings of inspection and range of motion normal.  *Id.*

The lower extremity exam was normal including findings of normal

inspection and range of motion.  Tr. 485.  Psychiatric exam was normal.

Plaintiff was discharged to follow-up with his primary care physician.  *Id*.

Chest films were negative.  *Id*.[21]

On November 9, 2016, St. Joseph Medical Clinic referred Plaintiff to

Dr. Philip Drickla, but it is not clear that this referral was filled.  Tr. 511.

At this juncture of Plaintiff's care and treatment, Plaintiff's subjective

complaints and objective tests do not support Dr. Schneider's MMS of

January 2016.  The medical records indicate that his subjective complaints

begin to show a deterioration in his overall condition, although the objective

test results do not until in and around March/May/June 2017 and

specifically with the nurse/dietician foot exam of June 12, 2017.  Tr. 554.

Lab reports from February 7, 2017, indicated Plaintiff continued to

suffer from elevated blood sugars, which were noted to be at 131 with an

A1C of 6.4.  Tr. 519-21.

On March 22, 2017, he returned to St. Joseph Medical Clinic,

indicating that his hips and legs go numb, carpal tunnel both hands and

finger tips were numb, and he had back problems for a long time.  Tr. 510;

*see* Tr. 557-60; *see also* Tr. 22, 24.[22]  The objective portion of the form

---

[21]  The reports of Plaintiff's physical condition, including his back and range of motion, are inconsistent with the other and earlier reports noted above.

[22]  The ALJ referred to the March 22nd notes that "include past medical history significant for diabetes mellitus, neuropathy, carpal tunnel, back pain and hypertension. The claimant was 5'11" and 296 pounds, diagnosed as obesity.  The notes indicate that

indicates "no radicular symptoms." Tr. 559. Other notations are difficult to read. Tr. 510, 559; *see* Tr. 508-09; *see also* Tr. 23. Another two-page form from Mark Edwards, M D., notes, in part, under physical examination, that Plaintiff was positive for diffuse lumbar tenderness and paraspinal muscle tension. Tr. 558. Under ROS, it is noted that he was positive for wrist/low back pain; numbness in hands and feet. *Id.*

The ALJ refers to several progress notes of May 8, 2017, from Dr. Schneider stating that Plaintiff was better on Lyrica, he exercised by walking, and ate everything in sight, Tr. 536, 555. Tr. 23. The nurse/dietician notes on that same progress note state, however, that Plaintiff suffered from bilateral foot pain on a scale of nine out of ten with ten being the most severe pain.[23] It is also noted: bilateral carpal tunnel braces; no foot screening; and FBS 110/glucose 96.50. Tr. 536, 555. *See* June 12, 2017 (*bilateral neuropathy in feet,* Tr. 551-52*)*, and June 19, 2017 (*feet without puncture redness or edema*). Tr. 549; *see* Tr. 23-24.

---

no radicular symptoms were present." Tr. 23. The ALJ again refers to the March 22nd notes that "indicate that no radicular symptoms were present in the hands or feet." Tr. 24.

[23] Plaintiff was examined by nurses on a routine basis. Nurse-practitioners are considered *other* medical sources. 20 C.F.R. § 404.1513(a)(1)-(2). Although their opinions may be considered, a nurse-practitioner's opinion is not entitled to the same weight as afforded the opinion of a treating physician. *See generally* Osterhoudt v. Astrue, No. 8:10-CV-336-T-TGW, 2011 U.S. Dist. LEXIS 5781, at *7 (M.D. Fla. Jan. 14, 2011).

The initial hearing was held on June 7, 2017. Tr. 17, 74-109. A dialogue ensued between Plaintiff's counsel and the ALJ. Counsel argued that Plaintiff suffered from diabetic neuropathy separate from diabetes that caused the disabling symptoms. Tr. 78. The ALJ stated that Plaintiff had not received a "true" diagnosis of neuropathy. Tr. 79. Plaintiff wore braces on his hands but the ALJ was not convinced of the diagnosis of carpal tunnel syndrome due to a lack of a positive Tinel's test. Tr. 78-79. The ALJ stated that he would review evidence of foot examinations and monofilament tests that were correlated to 18 different locations. Tr. 80. The ALJ understood counsel's argument that the objective evidence indicated Plaintiff has diabetes, but noted that "everybody that has diabetes, doesn't have diabetic neuropathy." Tr. 82. Toward the end of the initial hearing, Plaintiff's counsel stated: "If the remaining issue is the insufficiency of Dr. Schneider's documentation or examinations, as a relates to the monofilament test, which was also not done in the CE, I would ask the Court to consider sending him out for a consultative exam, particularly on those things, to -- you know, if that's what the Court's chief concern is." Tr. 107. The ALJ responded:

> No. My concern was that the doctor didn't have anything in his records that supports his opinions. You know, have you -- ordinarily, when you see a doctor, who diagnosed carpal tunnel syndrome, don't you find whether they -- whether they do an exam and they say

> whether there's a positive [T]inel's or a positive finel [phonetic], when they exam the wrist and palm?  I mean that's one of the things they do and they say, oh, it's negative.  No problem with it.  Then they don't diagnose carpal tunnel.  Or they say one is positive and the other one isn't and none of that's in there.  It's just a guy says to the doctor, you know, I'm having trouble dropping stuff.  Okay.  Well, it must be carpal tunnel syndrome.  You know, that's all I was pointing out.

Tr. 107-08.  The dialogue continued with the ALJ stating that there was "nothing in the records that show things that would support the diagnosis [of diabetic neuropathy] other than that he complains that his feet hurt."  *Id.* Counsel reiterated that there was objective evidence of the underlying condition of diabetes, and that was why he was suggesting the ALJ consider a consultative examination if the ALJ was concerned about prior examinations or documentation.  *Id.*  The ALJ stated he would "consider it." *Id.* at 108.

The ALJ refers to the foot exam on June 12, 2017, and notes "secondary to neuropathy in feet assessed claimant was not wearing appropriate shoes or insert/orthotics."  Tr. 23; *see* Tr. 554 (The letter "N" on the exam notes is circled for the two questions pertaining to Plaintiff's "footware assessment."  There is no further explanation on that point.)  The ALJ questioned the lack of monofilament testing during the initial hearing. *See infra* at 28-29.

Also on June 12, 2017, *after* the initial hearing was held on June 7,

2017, the same documentation of the foot exam noted above states there

was positive 10 g monofilament testing on both the right and left foot.[24]

Tr. 554.  (The ALJ does not refer to this testing.  Tr. 23-24.)  The foot exam

form includes notations that Plaintiff was noted to register a level two on a

scale where zero indicates no complications.  Level one indicates a loss of

protective sensation with deformity or callus; *level two means a loss of*

*protective sensation with vascular disease*; and level three means a history

of ulceration or amputation.  *Id.*  The examination revealed Plaintiff showed

thick, elongated or ingrown nails as well as calluses or fissures.  Plaintiff

requested to see Dr. Schneider but was instructed to return to

Dr. Schneider the following Monday as Dr. Schneider was not present on

June 12, 2017.  Tr. 551.

On June 19, 2017, Plaintiff wanted to see Dr. Schneider due to the

disability hearing.  Plaintiff's blood sugar was 127 but it was also noted:

"Feet without puncture redness or edema."  Tr. 549.  There are also

progress notes from September 18 and 25, 2017, and on the latter date

---

[24]  The nurse notes of June 12, 2017, state in part bilateral neuropathy in feet; foot exam done.  Tr. 532.

Plaintiff was assessed as metabolic syndrome, carpal tunnel syndrome, and *neuropathy*.  Tr. 542, 545-46; *see* Tr. 23.

On June 19, 2017, an audio transcript was created between Plaintiff's counsel, Mr. MacLaren and Dr. Schneider.  Tr. 538-41.  This document was presented to the ALJ during the supplemental hearing on January 12, 2018, Tr. 37 (Exhibit B13F), but is not mentioned in the ALJ's decision. Tr. 17-27.

Dr. Schneider is board certified with specialties including obesity medicine, preventive medicine, and pain management.  Tr. 538. Dr. Schneider indicated that he treated Plaintiff and stated that he "absolutely" suffers from *diabetic neuropathy*.  Tr. 538.  Dr. Schneider states that Plaintiff's diabetes "is doing well" and "he is within acceptable results based on the medications he's on."  *Id.*  Plaintiff suffered from untreated diabetes years before he got help.  Tr. 539.  Dr. Schneider explained how diabetes leads to diabetic neuropathy.  Tr. 539-40.  The disease process is cumulative "[s]o diabetes over years and years and years has been a precipitating factor for the neuropathy along with a process that we call pan-inflammatory state.  So it's not just related to his feet or his legs, it's related to his coronary arteries, his brain, his arms, etc." Tr. 538-39.  Dr. Schneider also explained the inflammatory process that

occurs with persons with diabetes including loss of blood supply to their feet and they complain about "worsening, burning pain, numbness in their legs at night but also in the mornings when their walking as well.  It will cause bone effects; decreased blood supply as well.  You see some deformity of toes and you'll notice, particularly for example Mr. Hobbs, you'll see a loss of hair."  Tr. 540.  He indicated that *"[t]here are lots of more sophisticated tests that could be done, but they're not within the scope of the indigent free clinic."  Id.*  (emphasis added).  (The ALJ noted that Plaintiff "has a history of conservative treatment, consisting generally of routine physical examinations."  Tr. 23.)

Dr. Schneider concluded that the process had gone for "years and years and years of continued inflammatory insult."  Tr. 541.  He agreed his statements were true to the reasonably accurate standard of medical science.  *Id.*

On June 20, 2017, Plaintiff was seen at Sacred Heart Health System in the emergency room complaining of left flank pain (kidney stones).  Tr. 570-74.  The maximum severity of pain was rated at 9/10.  Tr. 574.  The symptoms were localized, left leg, radiation to the groin.  *Id.*  The onset was 4:30 a.m.  *Id.*  Current medications included Lyrica, Metformin, daily aspirin and lisinopril.  Tr. 575.  The physical examination results included, in part,

that Plaintiff was alert and oriented to person, place, and time; back examination included findings of normal inspection, no tenderness, no costovertebral angle tenderness; upper and lower extremity examination included findings of normal inspection, range of motion, and no edema; and the neurological exam included Plaintiff being oriented to person, place and time, and no focal motor deficits.  Tr. 576.  (It is noted that Plaintiff was last seen in the emergency room on May 19, 2016, for acute bronchitis unspecified.  *Id.*)  Doctor notes indicate that Plaintiff's "condition has improved" and he was discharged.  *Id.*  A CT of Plaintiff's abdomen and pelvis without a contrast was performed and basically normal.  Tr. 590.  These patient notes are not supportive of Plaintiff's disability claim.

Lab results of August 2, 2017, indicated an A1C of 7.6.  Tr. 560.  On September 20, 2017, Plaintiff had a return visit to St. Joseph Medical Clinic.  Tr. 595.  Lab results from September 25 and September 26, 2017, indicate Plaintiff's A1C was 6.1 and 7.5, respectively, and he was diagnosed with metabolic syndrome, carpal tunnel syndrome, and neuriopaty [sic]. Tr. 542, 566-68, 598; *see* Tr. 23.  Plaintiff reappeared for a return visit on October 4, 2017, and had no further chest pain as previously reported on September 20, 2017.  Handwritten notes state "toenails bilaterally," a decrease in vibratory and in sharp/dull sensation.  Tr. 593-95.

On October 4, 2017, Plaintiff was seen by Dr. Grace Torres Hodges;

he was referred by a primary care physician with St. Joseph Our Lady of

the Angels Clinic (Our Lady), elsewhere referred to as Our Lady of the

Angels, St. Joseph's Metabolic Clinic, Tr. 601.[25]  Tr. 599 (Exhibit B17F,

Report Dec. 18, 2017); *see* Tr. 23.  She saw him for a diabetic foot

evaluation and noted, in part:

> This patient has diabetic related changes to the foot noted primarily in
> the neurological and dermatological systems.  He is considered to be
> high at-risk patient because he has significant deficits and sensory
> nerves based on diminished vibratory, sharp/dull and
> Semmes/Weinstein testing.  He has loss of protective sensation of
> toes in the ball of the foot.  His gait is found to be ataxic with limp and
> use of a cane on the left side.  Skin presentation reveals atrophic skin
> with loss of hair growth and dystrophic toenails.  He has a pes planus
> foot type which results in valgus (tilted) position in his heels.

*Id*.  It was her "*opinion that this patient has typical bilateral presentation of*

*neuropathy associated diabetes with noted changes in the sensory, motor*

*and autonomic nervous systems based on his examination today*."  *Id*.

(emphasis in original).  Dr. Hodges advised Plaintiff

> that without proper glycemic control, daily self-assessment and
> proper foot and shoe care, he is at high risk for developing a problem
> in the foot without him knowing.  I have also advised him that he
> should limit his ambulation and walking because of the loss of nerve
> sensation and instability.  In the end, if he does not maintain good

---

[25]  Dr. Hodges examined Plaintiff once.  *See* <u>Crawford v. Comm'r of Soc. Sec.</u>,
363 F.3d 1155, 1160 (11th Cir. 2004) (noting a one-time examiner's opinion is not
entitled to great weight); <u>McSwain v. Bowen</u>, 814 F.2d 617, 619 (11th Cir. 1987).

care of his feet, this could lead to a break in the skin, ensue into an infection that could potentially lead to an amputation.

*Id.* (Report dated Dec. 18, 2017.)

The ALJ gave "[l]ittle weight" to Dr. Hodges' opinion "based on the MSS (Exhibit B17F) because it is inconsistent with the bulk of the medical evidence and the [RFC] finding. There is no evidence from the source to substantiate the restrictions and limitations assigned by Dr. Hodges, which gives less weight to her opinion." Tr. 24.

On December 11, 2017, Plaintiff was noncompliant on blood sugar testing, and had non-fasting blood sugars of 600. Tr. 602. Plaintiff had additional visits with Our Lady on December 11 and 18, 2017. Tr. 600-04; *see* Tr. 24

A supplemental hearing was held on January 12, 2018. Tr. 35. Counsel gave an opening statement, which focused on Dr. Hodges' evaluation used to support the opinion of limitation provided by Dr. Schneider. Tr. 37. The ALJ noted that Dr. Hodges' opinion only applied to walking and not standing. *Id.* Plaintiff briefly testified consistent with his allegedly disabling ailments. Tr. 38-40.

The vocational expert responded to several hypotheticals, testifying that no jobs could be performed by an individual that was off task 15 to 20% time at work due to exacerbations to pain and that a person that could

only walk, stand, and sit for one hour could not perform any jobs in the

economy.  Tr. 50-51.  Nevertheless, the vocational expert opined that

although Plaintiff was unable to perform any past relevant work, he was

able to perform several representative jobs, that of a mail clerk, and

information clerk and parking lot attendant, all light exertion and skilled with

an SVP's of 2.  Tr. 25-26, 57-71.

V.

Plaintiff argues the ALJ did not "set forth the 'good cause' necessary

to discredit the opinion of" Plaintiff's treating physician, Dr. Schneider, in

that the ALJ ignored the lengthy statement by Dr. Schneider of June 19,

2017, ignored the record evidence of Plaintiff's foot examinations, and

provided an inadequate rationale to discredit Dr. Schneider's opinion.  ECF

No. 15 at 2.

The Commissioner argues the medical evidence of record supports

the ALJ's decision to assign little weight to Dr. Schneider's opinion.  ECF

No. 16 at 12-15.[26]

---

[26] *See supra* at n.12.

The ALJ considered Dr. Schneider's opinion in his MSS, *see supra* at

24.  Tr. 22.  In his MSS dated January 13, 2016, Dr. Schneider

concluded that Plaintiff had a "permanent disability."[27]  Tr. 474.

The ALJ gave "little weight" to Dr. Schneider based on the MSS

because "the limitations assigned by the treating physician

[Dr. Schneider] exceed the [RFC]."  Tr. 24.  The ALJ further noted that

Dr. Schneider's "notes in May 2017 reference foot pain, but he

acknowledged the claimant was better on Lyrica (Exhibit B12F).  The

claimant had little treatment for neuropathy until 2017, but not in 2016

as [Dr. Schneider's] MSS indicate[s] [Tr. 473 (has neuropathy)], which

renders his opinion less persuasive."  *Id.*

---

[27]  Dr. Schneider's MSS is, for the most part, a series of checkbox notations,
Tr. 473-74, which courts have found are "not particularly informative" and are "weak
evidence at best."  *See* Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) ("Given that
the 'check-off form' did not cite any clinical test results or findings and Dr. Lowder's
previous treatment notes did not report any significant limitations due to back pain, the
ALJ found that the MSS was entitled to 'little evidentiary weight.'"); Dixon v. Astrue, No.
5:09-cv-320/RS/EMT, 2010 Dist. LEXIS 125831, at *46-48 (N.D. Fla. Oct. 26, 2010)
(explaining that ALJ properly rejected opinions expressed by treating physician on
"check-off" type forms where treating physician's own treatment notes did not support
opinions expressed on those forms); Jones v. Comm'r of Soc. Sec., 478 F. App'x 610,
612 (11th Cir. 2012) (unpublished) (holding that the boxes checked by the doctors did
not constitute their actual RFC assessment because checking boxes did not indicate the
degree and extent of the claimant's limitations); *see also* Foster v. Astrue, 410 F. App'x
831, 833 (5th Cir. 2011) (unpublished) (physicians use of "questionnaire" format typifies
"brief or conclusory" testimony).  When the MSS check box form was prepared,
Dr. Schneider did not provide an acceptable explanation for his opinions or refer to
objective medical evidence to support his opinions.  *See* Crawford v. Comm'r of Soc.
Sec., 363 F.3d 1155, 1159-60 (11th Cir. 2004).

VI.

The ALJ was "persuaded that that there is no evidence of change in the claimant's general [RFC] as of the day following the prior decision and RFC finding for light exertion.  (B1A)."  Tr. 21 (ALJ Pierce's decision).  The ALJ determined that Plaintiff has the RFC to perform light work with limitations such that he can perform several representative occupations that have a light exertion and are unskilled.  Tr. 21, 26; *see supra* at n.8.  Substantial evidence supports the ALJ's determination that Plaintiff was not disabled as of March 22, 2014, the day following the prior decision.

But, beginning in and around January 2016, approximately two and one-half years transpired before the ALJ issued his decision at issue here and the medical evidence during that interval became more supportive of Plaintiff's claims.  Substantial evidence does not support the ALJ's determination that Plaintiff was not disabled at some point in time thereafter through the date of the ALJ's decision.  This conclusion is based on a review of the entire record and the lack of a consultative examination, with the last such physical examination occurring in September 2015.  Tr. 459-63; *see* Tr. 22, 24.

VII.

The ALJ rejected Dr. Schneider's January 2016 MSS assessment.  In so doing, the ALJ noted that Plaintiff "had little treatment for neuropathy until 2017, but not in [January] 2016 as" Dr. Schneider's MMS indicates, *see* Tr. 473 ("has neuropathy").  Tr. 24.

Plaintiff is a charity care patient who has received relatively consistent blood testing and care for the most part at St. Joseph Medical Clinic.  In the light most favorable to the ALJ, on or about December 2014, it is noted that Plaintiff was on diabetic drugs including Metformin and that he had blurry vision at times.  Thereafter in 2015, lab reports included reports of Type II diabetes, weight gain, *peripheral neuropathy*, obesity, and AIC's of 10.9 as of August 5, 2014, but 5.5 on April 9, 2015.  *See supra* at 18-19.

On September 22, 2015, Plaintiff was seen by Dr. Kasabian for a disability examination and reported having hypertension, diabetes, low back pain, *etc.*  Tr. 459.  Range of motion tests were normal and Dr. Kasabian's impressions included history of low back pain, bilateral hip pain, liver enzyme elevation, hypertension, diabetes, and possible eczema. Tr. 460.  The ALJ considered this evaluation.  Tr. 22.

On September 29, 2015, Dr. Hirschhorn performed a general clinical evaluation with mental status.  Tr. 465.  In part, a thought disorder was not present and his IQ was found to be probably in the borderline or low average range.  Tr. 466.  Dr. Hirschhorn recommended Plaintiff be referred to a psychiatrist.  Tr. 466-67.  On February 16, 2016, Plaintiff was assessed at Lakeview Center, Baptist Health Care and Plaintiff was recommended to engage in OP (outpatient) group therapy to address issues primarily related to depression but was not recommended for OP (outpatient) psychiatry services at this time.  Tr. 535.  The ALJ considered these evaluations. Tr. 23.

On October 25, 2015, Plaintiff was seen in the emergency room at Sacred Heart Hospital complaining of right ankle pain.  Tr. 469-70, 495-507.  X-rays showed no acute fractures or dislocation; physical examination was generally normal, including Plaintiff's gait, although he ambulated with a cane.  Tr. 501.

Plaintiff had several blood tests in January, April, and August 2016 which range from AIC's 5.9 to 7.7 with an A1C of 6.4 in February 2017. Tr. 519-29.  On January 28, 2016, screening for diabetes revealed *neuropathy*, but the treatment notes of April 7, 2016 from Dr. McFadden make no mention of foot or hand problems.  Tr. 513.  Nevertheless,

although peripheral neuropathy is mentioned earlier in April 2015, Plaintiff's neuropathy was recognized in January 2016 and most likely recognized as a definitive diagnosis for the first time by Dr. Schneider.

Plaintiff attended the MSC at St. Joseph on January 6, 2016, complaining, in part, of back pain with a negative MRI and "hip pain but can walk." Tr. 518 (Dr. Schneider). Plaintiff again complained of lower back pain on January 13, 2016, and disability forms were filled out. Tr. 517 (Dr. Schneider). On the same day, Dr. Schneider filled out the MSS. Tr. 473-74.

On January 28, 2016, Plaintiff returned to St. Joseph Medical Clinic for lab review and the assessment included hyperlipidemia, *neuropathy*, DM well controlled. His blood sugar was 122; he stated he feels well but lower back and legs remain painful. He was to start Crestor and Lyrica. Tr. 516.

Chronic neuropathy and pain are noted on February 26, 2016. Tr. 532. High fasting sugars are noted on April 7, 2016, and that Plaintiff was out of blood pressure medicine and his pressure readings were high. Tr. 513; *see* Tr. 522-23. Blood sugars and A1C remained elevated in February 2017.

Plaintiff was examined at emergency room at Sacred Heart Hospital on May 19, 2016, complaining of cough/congestion and records show Type II diabetes without complication and essential hypertension as clinical diagnoses.  Tr. 479-83; *see* Tr. 22.  The ROS remarks are not noteworthy except for noting a history of diabetes, HTN, and DDD.  Tr. 484.

On March 22, 2017, Plaintiff returned to St. Joseph Medical Clinic complaining that his hips and legs go numb, carpal tunnel in both hands and finger tips were numb, and he had back problems for a long time.  Tr. 508, 510, 599; *see* Tr. 22, 24.  Past medical history indicated he suffered from neuropathy, diabetes, and carpal tunnel syndrome and that Plaintiff needs a history and physical from Dr. Schneider (Snyder).  Tr. 508, 557.  Other notes from March 22, 2017, state "no radicular symptoms" under the "Objective" portions of the notes, and other hand writing that is difficult to read, under "Assessment", although SLR, motor intact is noted.  Tr. 559.  Typewritten notes from May 2017 at St. Joseph Medical Clinic report foot pain at nine, although his pain was "better" with Lyrica and his blood sugar was well controlled that day.  Tr. 536.  The "Objective" portion of the form indicates "metabolic syndrome."  *Id.*

Plaintiff's AIC readings from June, August, in September 2017 range from 6.1 to 7.6.  Tr. 561, 566-68.

Progress notes from June 12, 2017, indicate *bilateral neuropathy* in feet. Tr. 549-55; *see* Tr. 23-24. On June 19, 2017, Plaintiff requested to see Dr. Schneider due to the disability hearing; it is noted: "Feet without puncture redness or edema." Tr. 549. Progress notes from September 18 and 25, 2017, and on the latter date assessed as metabolic syndrome, carpal tunnel syndrome, and *neuropathy*. Tr. 542, 545-46; *see* Tr. 23.

On June 19, 2017, Dr. Schneider, via audio transcript, explained the general nature of his opinion regarding Plaintiff's disability. Tr. 538-41; *see supra* at 32-33. He opined that Plaintiff "absolutely" suffers from diabetic neuropathy and that the process had gone for "years and years and years of continued inflammatory insult area". Tr. 538, 541. The ALJ did not consider this information.[28] Tr. 21-25.

On June 20, 2017, Plaintiff was seen at Sacred Heart Health System in the emergency room complaining of left flank pain with pain rated at 9/10. Tr. 570-74. It is noted that Plaintiff's "condition has improved" and he was discharged. Tr. 576.

---

[28] The ALJ does not have to refer to all the evidence in the record. Mitchell v. Comm'r of Soc. Sec., 771 F.3d 782, 782 (11th Cir. 2014). The ALJ appropriately rejected Dr. Schneider's opinion derived from the January 2016 MSS. Nevertheless, as noted herein, Plaintiff's condition degraded during his examination and treatment with Dr. Schneider and others. Therefore, the ALJ should have expressly considered Dr. Schneider's updated assessment.

By September 20, 2017, Plaintiff's lab results indicated an A1C of 7.5. Tr. 598.  On December 11, 2017, Plaintiff was noncompliant on blood sugar testing and had non-fasting blood sugars of 600.   Tr. 602.

Lastly, Plaintiff was examined on October 4, 2017, by Dr. Hodges for a diabetic foot evaluation.  Tr. 599.  In part, Dr. Hodges determined that Plaintiff had diabetic-related changes noted primarily neurological and dermatological systems and considered him to be a "high at-risk patient because he has significant deficits and sensory nerves based on diminished vibratory, sharp/though and Semmes-Weinstein testing. He has loss of protective sensation of toes in the ball of the foot.  His gait is found to be ataxic with length and use of a cane on the left side.  Skin presentation reveals atrophic skin with loss of hair growth and dystrophic toenails.  He has a pes planus foot type which results in valgus (tilted) position in his heels."  *Id.*  Dr. Hodges told Plaintiff, in part, that "he should limit his ambulation and walking because of the loss of nerve sensation and instability."  *Id.*; *see supra* at 35-36.

The Court may not reweigh the evidence.  But evidence that detracts from the ALJ's findings and ultimate determinations of non-disability may be considered.  Although the record is not crystal clear as to the number of times Dr. Schneider, as a treating physician, examined and treated Plaintiff

as a charity patient, he was familiar with Plaintiff's physical condition and limitations that evolved over time, which became progressively worse by the time the supplemental video hearing was held on January 12, 2018.

During the June 7, 2017, initial video hearing, Plaintiff's counsel requested the ALJ to refer Plaintiff for a consultative examination.  Tr. 82, 108.  The ALJ took the matter under consideration but no referral is of record.  In light of the evolving nature of Plaintiff's physical condition and limitations, it would have been most beneficial to have such a consultative examination, especially in light of Dr. Hodges' October 4, 2017, evaluation.

The ALJ overly relied on the record review (given "significant weight") by Dr. Steele on January 20, 2016, which was limited and generally remote in time given Plaintiff's diminished physical condition and the decision rendered on July 5, 2018. Tr. 168; *see* Tr. 25.

The ALJ gave "little weight" to Dr. Schneider's opinion and, in so doing, did not mention Dr. Schneider's post-initial hearing evaluation that re-affirmed his prior MSS assessment in January 2016.  Standing alone, the ALJ's implicit rejection of Dr. Schneider's MSS evaluation is supported by substantial evidence.

Substantial evidence detracts, however, from the ALJ's ultimate assessment that Plaintiff was not disabled as of the date of the decision in

July 2018.  It is not for the undersigned to determine when Plaintiff became disabled, only to conclude that substantial evidence does not support the ALJ's determination at that point in time.

This case does not involve consideration of evidence of a condition that existed prior to the ALJ's hearing, but was not discovered until afterward, which may be new and non-cumulative.  *See generally* Enix v. Comm'r of Soc. Sec., 461 F. App'x 861, 863 (11th Cir. 2012) (unpublished).  In the latter case, "[e]vidence of deterioration of a previously-considered condition may subsequently entitle a claimant to benefit from a new application, but it is not probative of whether a person is disabled during the specific period under review."  *Id.* (citing Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999).  Rather, the evidence related to Plaintiff's condition existed before the decision.

The Court reviews the decision of the ALJ as to whether the claimant was entitled to benefits during a specific period, which period was necessarily *prior* to the date of the ALJ's decision.[29]  Wilson, 179 F.3d at

---

[29]  A complicating factor is that both Plaintiff's "impairment" and the "inability" to work must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual like Plaintiff is entitled to DIB if he is under a disability prior to the expiration of his insured status, here June 30, 2016, Tr. 17.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211.  On remand, it may be that Plaintiff will not be found to be disabled prior to June 30, 2016.  Nevertheless, these issues should be determined on remand.

1279.  On occasion ALJ's have determined that a claimant was not disabled at the time of their alleged onset date but became disabled at a later period and prior to the ALJ's decision.  *See, e.g.*, Ali v. Colvin, 236 F. Supp. 3d 86, 93 (D.D.C. Feb. 21, 2017).

Plaintiff bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim.  *See* 20 C.F.R. § 404.1512(a); Moore v. Barnhart, 405 F.3d at 1211.  On the other hand, an ALJ has a clear duty to fully and fairly develop the administrative record.  Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); 20 C.F.R. § 404.1512(b).  *See* Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.")).  Further, under Social Security Ruling 96-5p, the ALJ must make "every reasonable effort" to re-contact a medical source when the medical evidence does not support the source's opinion, and the ALJ cannot ascertain the basis for that opinion from the case record.  Vesy v. Astrue, 353 F. App'x 219, 225 (11th Cir. 2009) (unpublished); 20 C.F.R.

§ 404.1520b(b)(2)(i)-(ii).  The question here is whether there are "the kinds of gaps in the evidence necessary to demonstrate prejudice" to Plaintiff. Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).

Here, Plaintiff's counsel requested the ALJ to refer Plaintiff for a consultative examination at the initial hearing in June 2017.  The ALJ said he would consider the request.  Plaintiff's counsel re-contacted Dr. Schneider shortly after the initial hearing, not the ALJ.  It is problematic that the ALJ did not consider Dr. Schneider's follow-up evaluation especially considering his post-initial hearing statement.  The supplemental hearing was held in January 2018 and the decision rendered in July 2018, all without a consultative examination.  The failure to refer Plaintiff for a consultative examination in conjunction with Dr. Schneider's follow-up evaluation created a gap in the record that resulted in prejudice to Plaintiff. *See* Jackson v. Chater, 99 F.3d 1086, 1092 (11th Cir. 1996) (explaining that a "remand to develop a full and fair record in accordance with law is a sentence-four remand").  The ALJ did not follow controlling law when he failed to refer Plaintiff for a consultative examination.

No determination is made regarding if Plaintiff may have been disabled.  Reconsideration of this issue at the SSA level with the assistance of a consultative examination is recommended.

## V.  Conclusion

Considering the record, overall, the findings of the ALJ are not based upon substantial evidence in the record and the ALJ incorrectly applied the law considering the inadequate record.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and this case be **REMANDED** for further proceedings and Judgment entered for Plaintiff.

**IN CHAMBERS** at Tallahassee, Florida, on December 2, 2019.

**s/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  See 11th Cir. R. 3-1; 28 U.S.C. § 636.**